IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

03 JAN -2 PM 2: 26

U.S. DISTRICT COURT
N.D. OF ALABAMA

In Re:

**SPIRAL INDUSTRY, INC.**

      **Debtor**

**CLARENCE McCALEB, et al**

        **Appellant,**

**v.**                                  **CV 02-PT-2727-NE**

**REGIONS BANK**

        **Appellee**

**and**

**ENTERED**

JAN 2 2003

**TEN COURT, LLC.**

        **Appellant**

**v.**                                  **CV 02-PT-2729-NE**

**REGIONS BANK**

        **Appellee**

## MEMORANDUM OPINION

This cause comes on to be heard on the appeals of Ten Court, LLC (successor to AmSouth Bank) and Clarence McCaleb and Scott McCaleb d/b/a McCaleb Tool Supply from the bankruptcy court's order granting Regions Bank's Motion for Summary Judgment dated August 21, 2002.



The court initially notes that the bankruptcy court's order was prepared by the attorneys for the Appellee, Regions Bank, and the parties have agreed that the bankruptcy court's order is a verbatim adoption of that prepared order.  Such procedure has been criticized  by the United States Supreme Court, Anderson v. City of Bessemer, 470 U.S. 564, 571-72 (1985), and the Eleventh Circuit Court of Appeals, Chuda Sama v. Mazda Motor Corp., 123 F.3d 1353, 1375 n. 46 (11th Cir. 1997).[1]  Such criticism may be particularly appropriate in cases such as this where there are factual issues and legal issues not developed by the court initially deciding the case. Some of the issues are not addressed at all.  Others are addressed in a conclusory manner.  Some pertinent facts are omitted.

### Ten Court, LLC's Claim

In its discussion with the parties, this court learned that AmSouth's security interest may have been acquired and perfected with regard to property owned by the Debtor and located at a site other than the Project location and subsequently moved to the Project location.  This raises the factual issues as to when and under what circumstances the property was purchased, when it was moved to the Project location and when AmSouth's security interest was perfected.  It also raises significant legal issue(s) with regard to whether a creditor that has a perfected security interest in property loses the priority of that interest merely because the property is moved to a

---

[1]The court will not quote from said cases but suggests a reading thereof.  The court further notes that the entire issue of the priorities of the parties' security interests or liens was disposed of in a conclusory fashion in one sentence in paragraph 19 of the subject order.  Most of the "facts" recited in the order represent merely a procedural history.  This court is not criticizing the bankruptcy court, just indicating why the order might not fully develop the issues.  Some of the issues have not been adequately briefed by the parties before this court.

project such as the subject Project.[2]  None of these issues were addressed in the order.

If for no other reason, this court will remand the case so that the bankruptcy court can initially address these issues.  The court will later suggest other issues which should be addressed either initially or in a non-conclusory fashion.

## McCalebs' Claim

The McCalebs' claim may be more problematic for them than the Ten Court LLC's claim is for it.  Apparently the initial delivery and installation of the McCaleb fixtures was at the Project site.  Again, however, other than in a conclusory fashion, there was no development of the legal issue(s) related to the priority of the McCalebs' claim.  There may also be a factual issue as to whether the fixtures, as installed, constitute personal property or real property.  This court is not aware of the nature of the property and the bankruptcy court dealt only with conclusions.[3]  There may be a further question as to whether, if the property is personal rather than real, does mechanics lien law apply?  Did any establishment of a mechanics lien apply to the parties in this case?  Were they named as parties?  If for no other reasons, the McCalebs' claim will be remanded for initial or non-conclusory consideration.  Again, the court will suggest other possible issues.

## Other Issues

This case would appear to involve significant issues of Alabama law.  Notwithstanding

---

[2]By way of analogy (perhaps inappropriate), the court raises this question.  Assume that A has a security interest in all of B's furniture located at his Elm Street residence.  Further, assume that C has a prior security interest in B's furniture located in a house on Oak Street.  If B moves the furniture from Oak Street to Elm Street, does C lose his priority?

[3]Again, the court suggests another (perhaps inappropriate) analogy.  Assume that A has a first mortgage on B's residence on Elm Street.  Further, assume that C does work on said residence as to which it obtains a mechanics lien after A's mortgage is recorded.  How does Alabama law determine the relative priorities?

this, the subject order cites only one Alabama case for a very general proposition, and one California case for a slightly less general proposition. There is little, if any, discussion of the legal issues related to the priorities of the parties' claims other than in a purely conclusory fashion. In view of the foregoing, and the procedure by which the subject order was prepared, the court directs that all issues be considered anew without regard to prior determinations.

Among the additional issues which should be considered are the following:

(1)  Have there been any grants of any security interests or liens to the Trustee by the Debtor directly, as opposed to grants by the Board or Issuer?

(2)  Is there any specific statutory or case authority for the proposition that all property which is placed in or on the Project becomes subject to a prior Trustee security interest or lien regardless of any other perfected security interests or liens?

(3)  Does the Trustee have a "statutory" lien as is stated in paragraph 16 of the subject order or is the lien or security interest solely as stated in the Indenture?

(4)  When the Debtor "was appointed purchasing agent for the Board," was there a contemplation of what funds would be used to make the purchases?  (See paragraph 18 of the subject order.)  Did being a purchasing agent contemplate the bringing in of property otherwise owned by the Debtor or purchasing with funds not part of the bond proceeds?

The parties may raise other specific issues for consideration by the bankruptcy court. This court does not determine, one way or the other, whether the bankruptcy court's ultimate decisions are in error, only that the issues have not been adequately addressed and that a more complete consideration may indicate errors. The court attaches, for whatever value they may have, questions posed by the court to the parties and their responses. The court also attaches a

4

statute and a case which may have a bearing on the mechanics lien issue. The court further notes

that it has conducted at least one recorded phone conference with the parties.

This the ___ day of January, 2003.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

5

**Robert Propst**

12/12/2002 03:43 PM

To:  Sharon Lawley/ALND/11/USCOURTS@USCOURTS

cc:

Subject:

After you set up phone conference in Spiral, forward this to attorneys. Among other questions, please answer following: (1) Is there any definition of "personal property" in any of the IDB documents? What? (2) If the pertinent clause in the Trust Indenture had simply ended with "The personal property" and had not proceeded further, what personal property would have been included (where located, how determined?)?(3) Is there any issue other than construing the said pertinent clause, What?(4)  Is there any statutory lien created in favor of the IDB trustee broader than what is stated in the trust instrument? Any case that says so?(5) Did the Board grant AmSouth's purported security interest?(6) What part of 4.8 lends itself to Region's argument that it applies only to property purchased after the project is completed?(7) What does 4.7 say?  You can respond by e mail. Please do so prior to the hearing. Also give me a succinct list of any language which should be focused on and any precisely on point controlling cases, not just persuasive ones.

**Robert Propst**
12/13/2002 07:47 AM

To: Sharon Lawley/ALND/11/USCOURTS@USCOURTS
cc:
Subject:

Further questions to forward in Spiral. (1) Does 4.8 have application to the McCalebs? Is a mechanics lien considered a "granted" security interest? (2) If the AmSouth assignee can show that it was granted a security interest "in connection with the acquisition" of property, why would 4.8 not apply to it? Would it have to show that it was a specific purchase money transaction?(3) Does the"Project" include all personal property on site unless excluded by 4.8? Was the total "Project" with the possible exception of 4.8 property assigned as part of the "Trust Estate" as stated by AmSouth  on page 7 of its brief? (4) Has what was purchased with bond proceeds ever been specifically identified in anyway? Same question, proceeds from Amsouth? MccCalebs? (5) Is it true that the property in dispute was all purchased after the bond proceeds had been disbursed by ART? Is there any evidence that the bond proceeds were used to purchase the disputed property? Any evidence that other proceeds were so used? (NOTE: All references to Am South include Ten Court).  ( 6) Are the subject provisions at least ambiguous? If so, what is correct approach? (7) Is there a question of fact as to what property was purchased with what proceeds? As to whether the AmSouth security interest was granted "in connection with the acquisition" of the specific property in dispute?

**Robert Propst**
12/13/2002 07:58 AM

To: Sharon Lawley/ALND/11/USCOURTS@USCOURTS
cc:
Subject:

Another forward in Spiral : (1) If the disputed property was not acquired "in connection" with the granting of a security interest would it not be covered as part of the "Project" because it was not removed by the Lessee "while the Lessee is not in default"? (2) What is the dispute between AmSouth and McCaleb? Has that ever been ruled on by the bankruptcy court? If the court does not rule in favor of Regions should that dispute be remanded for initial consideration? (3) What issues has the court not raised with its e mail questions?

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

In Re:                              )
                                    )
    SPIRAL INDUSTRY, INC.,)     BANKRUPTCY
                                    )         CASE NO.:  01-81695-JAC-7
                                    )
    Debtor.     )


CLARENCE McCALEB and SCOTT          )
McCALEB d/b/a McCALEB TOOL          )
SUPPLY and TEN COURT, LLC,          )
                                    )
    Appellants,     )
                                    )
v.                                  )     CV-02-PT-2729-NE
                                    )
and REGIONS BANK,                   )
                                    )
    Appellee.     )

## APPELLANTS' RESPONSE TO QUESTIONS FROM THE COURT

Appellants hereby respond to the questions raised by the Court, and sent to the parties via email, as follows:

1.    Is there any definition of "personal property" in any of the IDB documents? What?

No.  The term "personal property" is not a defined term in either the Trust Indenture or the Lease.  However, Appellants contend that the term is defined by the phrase that follows it (the entire phrase, including the words "acquired with the proceeds of the Bonds").  Otherwise, it is ambiguous.  Because the term "personal property" is not defined, the maxim "expressio unius est exclusio alterius", which means "the expression of one thing excludes others" should be applied to give the provision meaning.  See, e.g. Flyge v. Flynn, 166 P.2d 539 (Nev. 1946).

Regions would have the Court give effect to only part of the phrase and construe the Clause as granting Regions an interest in all personal property "installed in or located on the Project Site or used in connection with the Project".  Such a construction is not only contrary to rules of construction, but is inconsistent with the intent of the parties, as expressed in the Lease.  The Lease, which was executed contemporaneously with the Trust Indenture, makes it clear that not all personal property brought onto the project site would be subject to Regions' lien.  See Section 1.1 (Definition of "Equipment."), Section 3.1 ("Demising Clauses"), Section 4.2 ("Lessee

Appointed as Purchasing Agent."), Section 4.8 ("Installation by Lessee of its Own Machinery and Equipment.") and Exhibit B. All of these provisions exclude assets owned by the Lessee (Spiral) or third parties and brought onto the project site from the property constituting the collateral for the IDB Bond issue. Because all of the assets made the basis of this proceeding were brought onto the project site, the only objective and meaningful way to distinguish between which of the assets are, and are not, subject to Regions' lien is to determine whether the property was "acquired with the proceeds of the Bonds."

2.      If the pertinent clause in the Trust Indenture had simply ended with "The personal property" and had not proceeded further, what personal property would have been included (where located, how determined?)?

        This question highlights the problem with the construction advanced by Regions and adopted by the Bankruptcy Court. The phrase "The personal property," standing alone, is too indefinite and ambiguous to have any meaning. Reading the phrase "The personal property" as defined by the words that follow it is the most reasonable way to construe the clause, and the only way to do so without rendering it ambiguous.

        If the clause had not proceeded further, the outer limits of the term "personal property" would be much more difficult to ascertain. The Bankruptcy Court Order demonstrates this problem. See Order at ¶ 15 ("Without having to define the outer limits of the personal property that is subject to Regions' lien, for purposes of this opinion it is sufficient to say that Granting Clause Sixth includes all of the Personal Property Collateral that is described in the Regions Motion.") The construction advanced by the Appellants resolves this problem and is consistent with the maxim "expressio unius est exclusio alterius." See Flyge v. Flynn, supra.

        In the alternative, one can look at the Lease and see the expressed intent of the parties not to give the IDB an interest in all personal property brought onto the project. See e.g., Section 3.1. The IDB's interest extends only to the property purchased by, or in the name of, the IDB for the project. Lease, Section 4.1, 4.2. Its interest clearly does not extend to property owned by Spiral or third parties. It seems the only objective way to determine what property was purchased by or in the name of the IDB is to see what was purchased with the IDB bond money.

3.      Is there any issue other than construing the said pertinent clause? What?

        Yes. If Granting Clause Sixth is construed, as Appellants contend it should be, as only giving Regions a lien on "certain machinery and equipment acquired with the proceeds of the Bonds and installed in or located on the Project Site or used in connection with the Project," then there is a factual issue as to which of the items in question, if any, meet these criteria and are thus subject to Regions' lien. This factual analysis is somewhat complicated because records of the disbursements from the Project Fund were not created and maintained as set forth in the Trust Indenture. See Trust Indenture, Section 4.2. Funds were apparently routinely disbursed by Regions without any specific explanation from Spiral of the project cost necessitating the disbursement. The evidence presented to the Bankruptcy Court indicates only a few of the items

at issue here were actually purchased with bond money.  See Affidavit of Brenton K. Morris.

4.      Is there any statutory lien created in favor of the IDB trustee broader than what is stated in the trust instrument? Any case that says so?

        No.  The relevant statute is Alabama Code Section 11-54-90, which states in pertinent part as follows:

> The principal of and interest on any bonds issued by the industrial development board shall be secured by a pledge of the revenues and receipts out of which the same shall be made payable *and may be secured by a mortgage or deed of trust covering all or any part of the projects from which the revenues or receipts so pledged may be derived, including any enlargements of and additions to any such projects thereafter made.*

Ala. Code § 11-54-90 (italics added).  The statute authorizes the taking of a mortgage or security interest, but does not, itself, grant or create any interest in property.

5.      Did the Board grant AmSouth's purported security interest?

        No.  On February 16, 2000, about a year before defaulting on the IDB Lease, Spiral executed two Security Agreements in favor of AmSouth, by which AmSouth was granted a security interest in, among other things, Spiral inventory and equipment wherever located. This interest was perfected on September 28, 2000 by the filing of a financing statement with the Secretary of State.   Ten Court now holds this perfected security interest, as assignee of AmSouth.

6.      What part of 4.8 lends itself to Region's argument that it applies only to property purchased after the project is completed?

        None of it.  If that was the intent, it could have been easily stated.

7.      What does 4.7 say?

        Section 4.7 is about three pages long and deals with removal, substitution and replacement of "Equipment."   The term "Equipment" is defined in the lease, although in somewhat of a circular fashion.  The definition is quoted in Appellee's Brief of Regions Bank on page 18.  In general, Section 4.7 extends Regions' lien to substitute and replacement Equipment.

8.      Give me a succinct list of any language which should be focused on and any precisely on point controlling cases, not just persuasive ones.

Trust Indenture:
Granting Clause Sixth
Section 4.2 (Disbursements from and Records of Project Fund.)

Lease Agreement:
Section 1.1 (Definition of "Equipment.")
Section 3.1 ("Demising Clauses")
Section 4.1 ("Agreement to Acquire and Construct Facilities and
Section 4.2 ("Lessee Appointed as Purchasing Agent.")
Section 4.8 ("Installation by Lessee of its Own Machinery and Equipment.")
Exhibit B.

9.    Does 4.8 have application to the McCalebs? Is a mechanics lien considered a "granted"
      security interest?

      A mechanics lien is a non-consensual statutory lien, as opposed to a consensual lien
which would be "granted" by a borrower, such as the Article 9 security interest given to
AmSouth by Spiral.  Counsel for Ten Court defers to counsel for McCaleb for the answer to the
question concerning the applicability of Lease Section 4.8.

10.   If the AmSouth assignee can show that it was granted a security interest "in connection
      with the acquisition" of property, why would 4.8 not apply to it?

      It would apply.  However, Ten Court contends that such a showing is not necessary.
Although the IDB lien is outside the scope of Article 9, the IDB could not obtain greater rights in
the property of Spiral Industry than Spiral itself had.  AmSouth security interest was properly
perfected, so, to the extent it attached to the subject assets, neither the IDB nor Regions, as its
assignee, could subsequently "step in front" of AmSouth and supersede its rights with respect to
those assets, unless AmSouth consented to subordinate its lien.  Spiral also could not, by taking
the property onto the project site, divest AmSouth of its perfected interest in the property.

      No attempt has been made, at this time, to show that AmSouth security interest was
granted "in connection with the acquisition" of the property at issue.

11.   Would it have to show that it was a specific purchase money transaction?

      No.  This would place an undue and unreasonable burden on AmSouth.  AmSouth was
given a blanket lien on all inventory and equipment of Spiral Industry.  In contrast, the IDB only
has an interest in the property described in the IDB documents.   To the extent the assets
constitute property of Spiral Industry, as opposed to being the property of the IDB, AmSouth
lien takes priority.

12.   Does the "Project" include all personal property on site unless excluded by 4.8?

      No.  The term "Project" is defined on page 12 of the Trust Indenture and on page 9 of the
Lease.   What constitutes the "Project," as indicated in the stated definitions, is subject to
limitations expressed throughout both documents. See, e.g., Lease, Section 3.1 "( . . but not
including, however, any machinery or equipment or other personal property that, under the terms
hereof, is, or is to become (prior to the termination of these presents), the sole property of the

Lessee or third parties)  Section 4.8 does not define what constitutes "Project" or "the personal property."

13.     Was the total "Project" with the possible exception of 4.8 property assigned as part of the "Trust Estate" as stated by AmSouth on page 7 of its brief?

        No.  The IDB assigned *all* its rights in the Project to Regions, but Section 4.8 is not the only limitation on the IDB's interest.

14.     Has what was purchased with bond proceeds ever been specifically identified in anyway? Same question, proceeds from Amsouth? MccCalebs?

        There are competing and conflicting affidavits on this point.  The Affidavit of Patsy Copeland, submitted by Regions, attempts to show that many of the assets were purchased with bond proceeds.  However, the Affidavit of Brenton K. Morris, shows that only a few of the items could have been purchased with bond proceeds.  Significantly, most of the bond proceeds were disbursed and spent prior to July 1999, while most of the assets made the basis of this proceeding were purchased after that time, after the bond proceeds had been spent.

15.     Is it true that the property in dispute was all purchased after the bond proceeds had been disbursed by ART?

        It's not quite that clear.  Nearly all of the assets appear to have been purchased after substantially all of the bond proceeds had been spent.  The ART general ledger information shows all the activity in the ART operating account.  It is clear that many of the checks Regions claims to represent expenditures of bond proceeds were not, in fact, expenditures of bond proceeds, but were checks "covered" by monies from other sources, such as transfers from Spiral Industry and Dencraft.  See Affidavit of Brenton K. Morris.

16.     Is there any evidence that the bond proceeds were used to purchase the disputed property?  Any evidence that other proceeds were so used?  (NOTE: All references to AmSouth include Ten Court).

        Yes.  The evidence indicates that bond proceeds may have been used to purchase a few of the items, but other proceeds were used to purchase most, if not all, of the disputed property.

17.     Are the subject provisions at least ambiguous? If so, what is correct approach?

        Ten Court contends that the subject provision (Granting Clause Sixth of the Trust Indenture) is subject to only one reasonable interpretation, i.e., that Regions was given a lien on the "machinery and equipment acquired with the proceeds of the bonds and installed in or located on the project site or used in connection with the project. The alternative construction creates ambiguity by raising questions as to what "personal property" was intended.  If the drafter intended to describe only a portion of the personal property" assigned, words such as "but not limited to" or "without limitation" could have been used after the word "including."  Absent such language, the maxim expressio unius est exclusio alterius dictates that the language be

construed as excluding all personal property which is not described.

18.   Is there a question of fact as to what property was purchased with what proceeds?

Yes.  The ART general ledger information shows the sources of funds which "covered" various checks, but it is more difficult to determine precisely what item or items were purchased with a given check.  It can be, and has been, shown that only a few of the subject assets could have been purchased with bond proceeds, based on the timing and the funds available at the time of the purchase.

19.   As to whether the AmSouth security interest was granted "in connection with the acquisition" of the specific property in dispute?

This issue has not been raised up to this point.  Ten Court contends that such showing is not required.

20.   If the disputed property was not acquired "in connection" with the granting of a security interest would it not be covered as part of the "Project" because it was not removed by the Lessee "while the Lessee is not in default"?

No.  See Answers to Questions 10-12 above.  The property could only become part of the "Project" if it was purchased by or in the name of the IDB with bond proceeds.  The Lease is just an agreement between Spiral and the IDB.  The IDB, by contracting with Spiral, could not supplant the rights of third parties.

21.   What is the dispute between AmSouth and McCaleb? Has that ever been ruled on by the bankruptcy court? If the court does not rule in favor of Regions should that dispute be remanded for initial consideration?

AmSouth and McCaleb have settled their dispute.

22.   What issues has the court not raised with its e-mail questions?
None.  Ten Court would simply add that, in its view, the lien granted to the IDB is effectively a purchase money security interest.  The bond issue was simply a form of financing.  The purpose of the bond issue was to finance the construction and equipping of a new manufacturing plant.  Repayment of the "loan" (bond proceeds) was to be secured by the property purchased with the bond proceeds, to include land, the improvements thereon and equipment.  Had Regions demanded the proper information from Spiral in connection with the bond requisitions, as set forth in Section 4.2 (Disbursements from and Records of Project Fund.), determining what specific items were purchased with the bond proceeds would not be difficult.  Most of the requisitions, however, contain no description whatsoever of the project development costs for which the disbursement was requested, or to whom the money was to be paid.  Regions apparently wired money into the ART as requested without questioning where, or how, the money would be spent.

12/16/02        RESPONSE OF McCALEB TO COURT INQUIRY:

1.     **Is there any definition of "personal property" in any of the IDB documents?  What?**

       McCaleb is unaware of any definition of the term "personal property" in the IDB documents.

2.     **If the pertinent clause in the Trust Indenture had simply ended with "e personal property" and had not proceeded further, what personal property would have been included (where located, how determined)?**

       It is the contention of McCaleb that the Trust Indenture merely grants rights from the Industrial Development Board to Regions, as the trustee of the bonds.  If items are not purchased with the bond proceeds, but are instead contracted for by the lessee, then the property would not be part of the Regions collateral package.  Specifically, as to the items which are the basis of the McCaleb mechanics lien judgment, all of the provisions of Exhibit A to the Motion for Summary Judgment by McCaleb were sold to Spiral, not the IDB.  If the IDB took no title to the property, then the property could not be pledged as part of the IDB documents.

3.     **Is there any issue other than construing the said pertinent clause?  What?**

       The only issue are the granting clause and the interpretation of such in Section 4.8 of the Lease.

4.     **Is there any statutory lien created in favor of the IDB trustee broader than what is stated in the trust instrument?  Any case that says so?**

       No.  Alabama Code Section 11-54-90 is permissive.  This section states that the bond proceeds "may be secured" by "all or any part of" a project.  The documents must control as to whether an IDB is granted security.

5.     **Did the Board grant AmSouth's purported security interest?**

       No.

6.     **What part of 4.8 lends itself to Regions argument that it applies only to property purchased after the project is completed?**

None.

7. **What does 4.7 say?**

Section 4.7 of the Lease provides for a replacement lien in the event that certain equipment which was part of the collateral package is removed, substituted or replaced. McCaleb contends that there is no application of 4.7 to this transaction.

8. **If the disputed property was not acquired "in connection" with the granting of a security interest, would it not be covered as part of the "Project" because it was not removed by the Lessee "while the Lessee is not in default"?**

The disputed property would not be part of the project because it was acquired by Spiral, and the disputed property was not paid for with bond issue proceeds.

9. **What is the dispute between AmSouth and McCaleb? Has that ever been ruled on by the bankruptcy court? If the court does not rule in favor of Regions should that dispute be remanded for initial consideration?**

AmSouth and McCaleb have resolved their dispute.

10. **What issues has the court not raised with its e-mail questions?**

None.

11. **Does 4.8 have application to the McCaleb? Is a mechanics lien considered a "granted" security interest?**

Section 4.8 of the Lease has application to McCaleb only to the extent that it allows their mechanic's liens to have a priority position over the trade fixtures which had been affixed to the new plant facility. In fact, McCaleb proceeds, in the form of unpaid vendor invoices, were used, creating a purchase money security interest.

12. **If the AmSouth assignee can show that it was granted a security "interest in connection with the acquisition" of property, why would 4.8 not apply to it? Would it have to show that it was a specific purchase money transaction?**

McCaleb contends that AmSouth should prevail under Section 4.8 of the Lease.

13.  Does the "Project" include all personal property on site unless excluded by 4.8?  Was the total "Project" with the possible exception of 4.8 property assigned as part of the "Trust Estate" as stated by AmSouth on page 7 of its brief?

Yes.

14.  Has what was purchased from bond proceeds ever been specifically identified in anyway?  Same question, proceeds from AmSouth?  McCalebs?

The disputed items subject to McCaleb's mechanic's lien claim are identified in Exhibit A to McCaleb's Motion for Summary Judgment which is record item 22.

15.  Is it true that the property in dispute was all purchased after the bond proceeds had been disbursed by ART?  Is there any evidence that the bond proceeds were used to purchase the disputed property?  Any evidence that other proceeds were so used? (NOTE: All references to AmSouth include Ten Court).

All disputed items purchased by Spiral from McCaleb occurred from September of 1999 through November of 1999.  Only Requisition 21, for $6,892.31, and dated October 31, 1999, and Requisition 22, dated January 11, 2000, in the amount of $6,800.00 were after the McCaleb purchases.  This is out of a total of $6,123,192.31 of total Regions proceeds which were funded.  None of the funds were used to purchase the disputed property.

16.  Are the subject provisions at least ambiguous?  If so, what is correct approach?

McCaleb contends that the provisions are not ambiguous and that it was entitled to judgment as a matter of law because of the exclusionary language of Section 4.8, as well as the fact that the property in question was not owned by th IDB and not subject to the Lease.

17.  Is there a question of fact as to what property was purchased with what proceeds?  As to whether the AmSouth security interest was granted connection with the acquisition" of the specific property in dispute?

None of the McCaleb disputed property was purchased with bond proceeds.

# <u>MEMORANDUM</u>

TO:         Honorable Robert B. Propst
                    U.S. District Court, Northern District of Alabama

CC:                  Stuart M. Maples, Esq.
                    Lee R. Benton, Esq.

FROM:      W. Clark Watson – Balch & Bingham, LLP

RE:         *McCaleb v. Regions Bank*
             U.S. District Court – N.D. Ala.
             CV 02-PT-2729-NE; CV 02-PT-2727-NE (consolidated)

DATE:           December 17, 2002

---

      The purpose of this memorandum is to respond to the various questions posed by the Court in its earlier emails.

1.    *Is there any definition of "personal property" in the IDB documents?*

      The term "personal property" is not specifically defined in the Trust Indenture or the Lease. The term is employed, however, in the Trust Indenture in the definition of "Project" (page 12). Likewise, the Lease does not define the term, but it is used in the definitions of "Equipment" (page 5) and "Independent Appraiser" (page 6) and referred to in several other provisions of the Lease: (a) the rule of construction for the term "mortgage" (page 10); (b) the Demising Clauses (page 14); (c) the provision allowing for the removal or substitution of certain Equipment (pages 18-19); and (d) the provision addressing the installation of Equipment not owned by the Board (page 20).

2.    *If the pertinent clause in the Trust Indenture had simply ended with "The personal property" and had not proceeded further, what personal property would have been included (where located, how determined)?*

      Had the language of Granting Clause Sixth been limited to "The personal property", the Bankruptcy Court would have been required to construe the legal meaning of the Trust Indenture, just as it did in the instant case. In performing that task, however, the term would not have been expressly limited to items of personal property owned by the Board "installed in or

611516

located on the Project Site or used in connection with the Project." Moreover, the Bankruptcy Court would not have had the benefit of the language that illustrates that the personal property referred to in Granting Clause Sixth includes, but is not limited to, "certain machinery and equipment acquired with the proceeds of the Bonds." It is highly probable, however, that the Bankruptcy Court would have reached the same result, since the "personal property" subject to the lien of the Trust Indenture should not include personal property owned by the Board that is installed in or located on an industrial development project other than the Project Site that was developed for Spiral Industry, Inc.

3.      *Is there any issue other than construing the said pertinent clause?  What?*

Once the Bankruptcy Court construed the Trust Indenture, and in particular, Granting Clause Sixth, the only remaining issue that the court was required to address was the relative priority of the Regions lien *vis-à-vis* the interests claimed by Ten Court, LLC and McCaleb. If the Bankruptcy Court had adopted the arguments advanced by the Appellants, a variety of other issues would have then been relevant, including what Bond proceeds were disbursed by Regions at the direction of Spiral, which specific items of personal property were acquired with those proceeds and where are each of those numerous items of personal property now located? The holding by the Bankruptcy Court, however, rendered those issues moot.

4.      *Is there any statutory lien created in favor of the IDB trustee broader than what is stated in the trust instrument?  If so, cite authority.*

A statutory lien is created for the benefit of the Board by virtue of Ala. Code § 11-54-90 (1975). That lien must include the revenues of the Project and may include "all or any parts of the projects from which the revenues or receipts so pledged may be derived..." Accordingly, a pledge of the revenues of an IDB project is mandatory and a pledge of tangible assets is optional. See Shores v. Sklar, 647 F.2d 462, 465 (5th Cir. 1981)

There is no reported Alabama decision that squarely addresses the scope of the lien created by Section 11-54-90. However, a similar statute was addressed by the United States District Court for the Central District of California in Alliance Capitol Management L.P. v. County of Orange 189 B.R. 499, in which the district court ruled that the California statute created a statutory lien that was effective without further action by the issuer. Id. At 503. Of course, Ala. Code.§ 11-54-90 permits the lien of the Board to be upon "all or any part of the projects."

Regions submits that in the instant case, the portion of the Project subject to the liens of the Board (and then assigned to Regions) are established pursuant to the terms of the Trust Indenture. Accordingly, Regions believes that both Section 11-54-90 and the Trust Indenture are equal in their scope as to the Personal Property Collateral.

2

5. *Did the Board grant AmSouth's purported security interest?*

No. The security interest in favor of AmSouth was granted by Spiral.

6. *What part of 4.8 lends itself to Regions' argument that it applies only to property purchased after the project is completed?*

Regions does not argue that Section 4.8 of the Lease is limited to purchases made by Spiral after the Project is completed. The language in the first paragraph of page 19 of Regions' brief is only illustrative of the need for such language. For example, Section 4.8 could also have been relevant if, during the construction of the Project, Spiral had granted a purchase money security interest to a third party lender or equipment lessor for specific items of equipment located at the Project. Neither Ten Court, LLC nor McCaleb provided such financing to Spiral.

7. *What does 4.7 say?*

Section 4.7 of the Lease address items of Equipment that are purchased to replace Equipment that becomes "inadequate, obsolete, worn-out, unsuitable, undesirable or unnecessary in the operation of the Facilities." Since the Facilities never became operational, Section 4.7 is irrelevant to this appeal.

8. *If the disputed property was not acquired "in connection" with the granting of a security interest, would it not be covered as part of the "Project" because it was not removed by the Lessee "while the Lessee is not in default"?*

Section 4.8 of the Lease allows Spiral, apart from its agency relationship with the Board, to install in the Facilities or on the Project Site and "at its own expense", items of personal property that will "facilitate the operation of the Project." To the extent that such items of property are not substitute collateral for Regions (see Section 4.7), such items may be removed from the Facilities "while [Spiral] is not in default under the terms of this Lease Agreement." Stated another way, certain items of personal property may be removed from the Facilities by Spiral if and only for so long as Spiral is not in default of its obligations to Regions. Those items may be removed by a party holding a security interest in the property or any equipment lessor that leases such machinery or equipment to Spiral, irrespective of whether Spiral is in default. Therefore, personal property that is not otherwise a part of the Project and which is subject to a security interest or lease authorized by Section 4.8 does not become a part of the Project due exclusively to a default by Spiral.

9. *What is the dispute between AmSouth and McCaleb? Has that ever been ruled on by the bankruptcy court? If the court does not rule in favor of Regions should that dispute be remanded*

3

*for initial consideration?*

Ten Court, LLC, as assignee of AmSouth, claims that the blanket security interest granted to AmSouth by Spiral gives Ten Court, LLC the senior security interest in the Personal Property Collateral. McCaleb claims that it has a mechanic's or materialman's lien in the Personal Property Collateral that is senior to the interest of Ten Court, LLC. Since the Bankruptcy Court concluded that the lien of Regions in all of the Personal Property Collateral is superior to the interests of both of the Appellants, Judge Caddell addressed neither the scope of the liens or other interests of the Appellants in the Personal Property Collateral. The ruling in favor of Regions rendered such issues moot for purposes of this adversary proceeding.

10. *What issues has the court not raised with its email questions?*

Regions submits that if the District Court (a) concurs in the construction of the Trust Indenture adopted by the Bankruptcy Court and (b) affirms the determination of Judge Caddell that the lien of Regions is superior to the interests claimed by the Appellants, then there are no other issues that are relevant to this appeal. There is no dispute as to the identity of the specific items of Personal Property Collateral or where they are located. Accordingly, the two issues described in (a) and (b) above, if determined consistent with the Order of the Bankruptcy Court, are dispositive of this case. If the District Court reverses the Order, there will be numerous other factual and legal issues to be considered.

11. *Does 4.8 have application to the McCalebs? Is a mechanics lien considered a "granted" security interest?*

Regions submits that Section 4.8 of the Lease has no application to the claims of McCaleb because neither its judgment lien nor its alleged mechanic's or materialman's lien are a "security interest" as referred to in this provision. Although the Lease does not include a specific definition of the term "security interest", the last paragraph of Section 1.1 does provides the following:

> As used herein, ...the Indenture and this Lease Agreement shall be a "security agreement" which creates a "security interest" in the Equipment within the meaning of the Uniform Commercial Code – Secured Transactions, <u>Code of Alabama</u>.

<u>Ala. Code</u> § 7-A-109(d) (1975) provides that Article 9 of the UCC does not apply to a lien created by statute (i.e., a mechanic's or materialman's lien). The interest claimed by McCaleb in the Personal Property Collateral is therefore not a security interest for purposes of Section 4.8. Moreover, by virtue of the requirements of Section 4.8, McCaleb would not be entitled to remove any of the Personal Property Equipment from the Project Site and thus, under any scenario, has no enforceable interest in it.

4

Section 4.8 of the Lease applies to certain items of personal property that are, among other things, installed by Spiral "at its own expense". Both McCaleb and Ten Court, LLC acknowledge that the Personal Property Collateral includes items for which no payment was ever made by Spiral or anyone else.

12. *If the AmSouth assignee can show that it was granted a security interest "in connection with the acquisition" of property, why would 4.8 not apply to it? Would it have to show that it was a specific purchase money transaction?*

Ten Court, LLC was not shown nor even alleged that its alleged security interest in the Personal Property Collateral was granted by Spiral to AmSouth "in connection with" the acquisition of such items for purposes of Section 4.8. In fact, the security agreement delivered by Spiral to AmSouth specifies that the collateral subject to AmSouth's security interest will be kept at the "old plant" – not the Project Site where the Personal Property Collateral is located. ( see Affidavit of Lewis Compton, Jr. attached to AmSouth's Motion for Summary Judgment). Had Ten Court, LLC made such an argument, it would have been required to show that AmSouth's loan to Spiral and the corresponding security interest granted to AmSouth by Spiral were "in connection with the acquisition" of the Personal Property Collateral. Although this language is not specifically defined in the Lease, it is evident that this would require either a purchase money interest or similar nexus. The language of the AmSouth security agreement contradicts any such argument.

13. *Does the "Project" include all personal property on site unless excluded by 4.8? Was the total "Project" with the possible exception of 4.8 property assigned as part of the "Trust Estate" as stated by AmSouth on page 7 of its brief?*

Yes. The Project includes all real, personal or real and personal property at the Project Site (see Trust Indenture p. 12; Lease, Recital no. 2, p.1). The lien of Regions in the Personal Property Collateral is determined by the Trust Indenture. The Lease defines those items of property that are leased by the Board to Spiral and the corresponding revenues (i.e., the "Pledged Revenues") that are assigned by the Board to Regions as security for the payment of the Bonds. The collateral interests of Regions created by the Trust Indenture include but are not limited to the Lease and the property subject to the Lease. The entirety of the Project was assigned to Regions subject only to the superior liens or security interests of third parties that are permissible under the terms of either the Trust Indenture or the Lease (e.g. Lease §§ 4.7 and 4.8). Regions submits that the interests claimed by Ten Court, LLC and McCaleb do not meet the requirements of either Section 4.7 or 4.8.

14. *Has what was purchased with bond proceeds ever been specifically identified in any way? Same question, proceeds from AmSouth? McCalebs?*

5

Since the Bankruptcy Court determined that the lien of Regions in the Personal Property Collateral was not limited to those items purchased with Bond proceeds, the Bankruptcy Court did not make a factual determination on that issue. Likewise, the Bankruptcy Court made no finding regarding the application of any funds loaned by AmSouth to Spiral or any credit granted by McCaleb to Spiral.

15.     *Is it true that the property in dispute was all purchased after the bond proceeds had been disbursed by ART? Is there any evidence that the bond proceeds were used to purchase the disputed property? Any evidence that other proceeds were so used?*

It is not true that all of the Personal Property Collateral was purchased after all of the Bond proceeds were disbursed by Regions. As noted in the Affidavit of Joanne Mayfield, there is a compelling nexus between many of the disbursements by Regions from the Bond Fund and the corresponding payment for many components of the Project. Although Ten Court, LLC contends generally that other funds were used to purchase some items of personal property, the specific sources and applications of such funds are vague.

16.     *Are the subject provisions at least ambiguous? If so, what is correct approach?*

Regions submits that Granting Clause Sixth of the Trust Indenture is not ambiguous. The meaning of each term used in that clause is clear and unequivocal. For example, no one questions the meaning of "personal property", "machinery and equipment", "proceeds of the Bonds", "installed in or located on the Project site" or "used in connection with the Project". There is no need for the court to consider anything beyond the four corners of the Trust Indenture to interpret the meaning of these terms. Instead, "construction" (rather than interpretation) of the Trust Indenture by the Bankruptcy Court was appropriately undertaken. As noted at pages 14 and 15 of the Regions Brief, construction of an agreement requires a court to determine, as a matter of law, the legal meaning of the Trust Indenture. See Bay Lines, Inc. v. Stoughton Trailers, Inc., 2002 WL 227940 (Ala. Feb. 15, 2002).

17.     *Is there a question of fact as to what property was purchased with what proceeds? As to whether the AmSouth security interest was granted "in connection with the acquisition" of the specific property in dispute?*

There is no evidence that the AmSouth security interest was granted in connection with the acquisition of the Personal Property Collateral. To the contrary, the record is clear that the security interest granted to AmSouth has no relationship to the Personal Property Collateral. The AmSouth security agreement indicates clearly that its loan was not in connection with the Project. As noted previously, the Bankruptcy Court made no finding as to the application of

6

specific funds to particular items of property.

7

CODE OF ALABAMA
TITLE 35. PROPERTY.
CHAPTER 11. LIENS.
ARTICLE 5. LIENS OF PARTICULAR PERSONS OR CLASSES OF PERSONS.
DIVISION 8. MECHANICS AND MATERIALMEN.

Copr © 2002 by State of Alabama. All rights reserved.

Current through End of 2002 Regular Session

§ 35-11-211. Priority of lien.

(a) Such lien as to the land and buildings or improvements thereon, shall have priority over all other liens, mortgages or incumbrances created subsequent to the commencement of work on the building or improvement.  Except to the extent provided in subsection (b) below, all liens, mortgages and incumbrances (in this section, "mortgages and other liens") created prior to the commencement of such work shall have priority over all liens for such work.  Enforcement of such lien of a mechanic, materialman or other person created by section 35-11- 210 (in this section, "mechanic or materialman lien") shall not affect any prior mortgage or other lien, and the purchaser in connection with the enforcement of such mechanic or materialman lien shall take the property subject to such prior mortgages and other liens of which the purchaser has actual or constructive notice on the date of the purchase.  Foreclosure of any prior mortgage or other lien shall terminate and extinguish such subordinate mechanic or materialman lien or other interest as to the land and the buildings and improvements thereon, whether or not at the time of such foreclosure such lien or interest has been perfected in accordance with the provisions of this division, and the mechanic, materialman or other person thereafter shall have, to the extent of his lawful claim under this division, the statutory right of redemption afforded under applicable redemption laws to a judgment creditor whose judgment was recorded on the date such work was commenced and such rights in any excess proceeds received by the foreclosing lienholder as provided by law.

(b) As to liens, mortgages or incumbrances created prior to the commencement of the work, the lien for such work shall have priority only against the building or improvement, the product of such work which is an entirety, separable from the land, building or improvement subject of the prior lien, mortgage or incumbrance, and which can be removed therefrom without impairing the value or security of any prior lien, mortgage or incumbrance;  and the person entitled to such lien may have it enforced, at any time prior to the foreclosure of such prior lien, mortgage or incumbrance, by a sale of such buildings or improvement under the provisions of this division and the purchaser may, within a reasonable time thereafter, remove the same.  If such mechanic or materialman lien for such work is not enforced prior to such foreclosure, the mechanic or materialman lien shall be terminated and extinguished and after such foreclosure, the mechanic, materialman or other person who held such mechanic or materialman lien thereafter shall have the statutory right of redemption and such rights in excess proceeds to the extent provided in subsection (a) above.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

AL ST § 35-11-211
Ala.Code 1975 § 35-11-211

(c) The provisions of this section clarify and confirm the intent of the legislature regarding existing law governing the matters contained in this section.  The provisions of this section shall apply to all mortgages and other liens and to all liens of a mechanic, materialman or other person created by section 35-11-210 existing on February 23, 1990 and those created or arising after February 23, 1990.

(Code 1876, § 3442;  Code 1886, § 3019;  Code 1896, § 2724;  Code 1907, § 4755; Code 1923, § 8833;  Acts 1933, Ex. Sess., No. 64, p. 54; Code 1940, T. 33, § 38; Acts 1990, No. 90-98, p. 107.)

<General Materials (GM) - References, Annotations, or Tables>

### HISTORY

**The 1990 amendment**, effective February 23, 1990, rewrote this section.

### RESEARCH REFERENCES

57 C.J.S. Mechanics' Liens, §§ 197-215.

53 Am. Jur. 2d, Mechanics' Liens, §§ 1, 6, 275.

53 Am. Jur. 2d, Mechanics' Lien, § 263-283.

Priorities of liens as against purchase-money mortgages or advances under previously executed mortgage. 73 A.L.R.2d 1407, 80 A.L.R.2d 179.

Mechanic's lien based on contract with vendor pending executory contract for sale of property as affecting purchaser's interest. 50 A.L.R.3d 944.

Construction mortgagee-lender's duty to protect interest of subordinated purchase-money mortgagee. 13 A.L.R.5th 684.

### CASENOTES

I.  **General Consideration.** .............................. enter p5
    II.  **Particular Liens and Rights.** ........................ enter p17
III.  **Subject Matter of Lien.** ............................. enter p37

I. GENERAL CONSIDERATION.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

565 So.2d 138
(Cite as: 565 So.2d 138)

▷

Supreme Court of Alabama.

BAILEY MORTGAGE COMPANY
v.
GOBBLE-FITE LUMBER COMPANY, INC.

88-372.

May 25, 1990.
Rehearing Denied Aug. 3, 1990.

Seller of building materials and supplies filed materialman's lien against properties, some of which had been foreclosed by mortgagee. The Madison Circuit Court, No. CV-88-725-J., Jeri W. Blankenship, J., entered default judgment for materialman and denied mortgagee's subsequent motion to set aside default judgment. Mortgagee appealed. The Supreme Court, Adams, J., held that holder of a prior mortgage that is superior to mechanic's or materialman's lien who forecloses and purchases property at foreclosure sale does not lose its priority.

Reversed and remanded.

Almon, J., filed specially concurring opinion in which Jones, J., concurred.

Steagall, J., filed opinion concurring in result.

West Headnotes

[1] Mechanics' Liens ☞115(4)
257k115(4) Most Cited Cases

Same written notice of mechanic's liens which had to be given to property owner had to simultaneously be given to construction lender if lender's identity could be reasonably obtained, in order to insure that mechanics and materialmen were paid out of remaining contract funds, that potential liens were satisfied, and that property was not encumbered. Code 1975, § 35-11-210 et seq.

[2] Mortgages ☞180
266k180 Most Cited Cases

Holder of a prior mortgage that is superior to a mechanic's or materialman's lien who forecloses and

purchases property at the foreclosure sale does not lose its priority; overruling *Lucas Construction, Inc. v. Hugel*, 551 So.2d 338; *Grimsley v. First Avenue Coal & Lumber Co.*, 217 Ala. 159, 115 So. 90; *Ex parte Douthit*, 480 So.2d 547. Code 1975, § 35-11-211.

[3] Mortgages ☞590
266k590 Most Cited Cases

If foreclosure of valid mortgage is properly conducted, all interests arising after the senior mortgage was created and all subordinate interest will be cut off unless junior lienors redeem during statutorily specified period.

[4] Mortgages ☞567(1)
266k567(1) Most Cited Cases

[4] Mortgages ☞567(2)
266k567(2) Most Cited Cases

After foreclosure sale of mortgaged property any surplus must be paid to mortgagor if there are no other liens on property, but if there are inferior liens and there is a surplus, all encumbrances inferior to mortgage on which sale is based must be paid in order of time in which they became liens.

[5] Judgment ☞143(3)
228k143(3) Most Cited Cases

Affidavits of two employees of foreclosing mortgagee, stating that due to inadvertence, mistake or excusable neglect, summons and complaint from materialman were misplaced after service of process was a reasonable explanation of mortgagee's inaction and precluded finding of culpability on its part which would preclude mortgagee from seeking to set aside default judgment.

[6] Judgment ☞143(3)
228k143(3) Most Cited Cases

[6] Judgment ☞145(4)
228k145(4) Most Cited Cases

[6] Judgment ☞146
228k146 Most Cited Cases

Foreclosing lender was entitled to have default judgment against it set aside based on its showing it was likely to prevail on its claim it obtained priority

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

with respect to subsequently filed materialman's lien, that materialman would not be unfairly prejudiced if default judgment were set aside, and that the default was not the result of its own culpable conduct.

*138 Alicia J. Putt of Smyer, White & Putt, Birmingham, for appellant.

Robert H. Harris of Harris, Caddell & Shanks, Decatur, for appellee.

ON APPLICATION FOR REHEARING

ADAMS, Justice.

On application for rehearing, our original opinion of November 3, 1989, is withdrawn, *139 and the following opinion is substituted therefor.

Bailey Mortgage Company (hereinafter "Bailey Mortgage") appeals from a denial of its motion to set aside a default judgment. For the reasons set forth below, we find that the trial court's refusal to set aside the default judgment was in error, and, accordingly, we reverse and remand.

I. FACTS

C.W. Buffington was engaged in the construction and sale of houses in Huntsville. Gobble-Fite Lumber Company, Inc. (hereinafter "Gobble-Fite"), a seller of building materials and supplies, entered into an agreement with Buffington for credit purchases from Gobble-Fite. Under the terms of the agreement, charges for the credit sales were to be maintained separately with respect to building materials and supplies used in the construction of each house.

From August 11, 1987, until December 21, 1987, Buffington made credit purchases from Gobble-Fite that were incorporated into certain houses on nine lots. Buffington did not make the requisite payment for the credit purchases when the accounts came due and payable in December 1987 and January 1988.

Bailey Mortgage held construction loan mortgages on five of the parcels of real property. Four of the mortgages had been recorded prior to the initial delivery of any building materials or supplies by Gobble-Fite. When Buffington defaulted on his mortgage payments, Bailey Mortgage initiated foreclosure proceedings on the four parcels. On March 10, 1988, Bailey Mortgage foreclosed on these four mortgages. At the public sale, Bailey purchased the four parcels of property for $299,101.07.

On March 10, 1988, the same day as the foreclosure, Gobble-Fite filed a statement of lien claim on five of the parcels of real property in the office of the judge of probate. On April 28, 1988, Gobble-Fite filed a statement of lien claim on the remaining parcels.

On April 29, 1988, Gobble-Fite sued Buffington, Bailey Mortgage, Keith E. and Carol D. Ford, [FN1] and numerous fictitiously named defendants. Gobble- Fite sought a twofold recovery: it sought and obtained a judgment against Buffington for materials sold and established a materialman's lien, pursuant to Ala.Code 1975, § 35-11-210 *et seq.,* against certain parcels of land. Each of the complaint's nine counts enumerated the basis and amount of Gobble- Fite's claim against a separate, specifically described parcel of property.

> FN1. On October 12, 1987, Buffington sold and conveyed Lot 2, Block 5, to Keith E. Ford and his wife, Carol D. Ford. On that same date the Fords executed and delivered to Bailey Mortgage a mortgage against that property, which was recorded on October 13, 1987. The Fords are defendants in this action, but the default judgment includes no determination with respect to the lien claim against the Fords' property, and the Fords are not a party to this appeal.

On June 28, 1988, upon Gobble-Fite's request, a default judgment was entered against Buffington and Bailey Mortgage. This judgment found the amount of Buffington's indebtedness to be $101,792.39, with interest, and established a materialman's lien against the described properties for that amount. Additionally, the judgment established Gobble-Fite's priority of lien with respect to any other liens or claims against, or interest in, the properties, including any interest held by Bailey Mortgage.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

On July 25, 1988, Bailey Mortgage filed a motion to set aside the default judgment, pursuant to Rule 55(c), A.R.Civ.P. This motion was deemed denied by operation of law after the expiration of 90 days, pursuant to Rule 59.1, A.R.Civ.P. Bailey Mortgage now appeals from the denial of its motion to set aside the default judgment.

## II. STANDARD OF REVIEW

The applicable standard of review in appeals arising from a trial court's order granting or denying a motion to set aside a default judgment is whether the trial court's decision constituted an abuse of discretion. *Kirtland v. Fort Morgan Authority Sewer Service, Inc.,* 524 So.2d 600 (Ala.1988); *140Johnson v. Moore,* 514 So.2d 1343 (Ala.1987) . Although Rule 55(c) vests the trial judge with a considerable amount of discretion, a ruling on a Rule 55(c) motion must not be made without taking into consideration restrictions on the use of that discretion and by examining certain guidelines. *Jones v. Hydro-Wave of Alabama, Inc.,* 524 So.2d 610, 613 (Ala.1988).

First, a trial judge, in exercising his discretion under Rule 55(c), must begin with the presumption that a litigant has a paramount right to defend on the merits and that, therefore, cases should be resolved on the merits whenever practicable. *Jones v. Hydro-Wave of Alabama, Inc.,* supra; *Kirtland v. Fort Morgan Authority Sewer Service, Inc.* Finally, when exercising discretion under Rule 55(c) , a trial court must consider the three-factor analysis enunciated by this Court in *Kirtland v. Fort Morgan Authority Sewer Service, Inc.,* supra. As a threshold matter, we must look at whether the defendant has a meritorious defense. Following this determination, we must consider "whether the plaintiff will be unfairly prejudiced if the default judgment is set aside" and "whether the defaultjudgment was a result of the defendant's own culpable conduct." *Kirtland,* supra, at 605.

## III. WHETHER THE DEFENDANT HAS A MERITORIOUS DEFENSE

As recently stated in *Ex parte Illinois Central Gulf R.R.,* 514 So.2d 1283 (Ala.1987), and reiterated in *Kirtland,* "to meet the meritorious-defense element, the movant need not satisfy the trial court that the movant would necessarily prevail at a trial on the merits, only that the movant is prepared to present a plausible defense." 514 So.2d at 1288. A

plausible defense is established by a viable legal theory supported by a factual basis. Bailey Mortgage claims that, despite its foreclosure on the four mortgages, it retains priority as a mortgagee by virtue of Ala.Code 1975, § 35-11-211. Before we can determine whether Bailey Mortgage has a meritorious defense established by a viable theory, and because of some confusion in our own case law, we must take a closer look at § 35-11-211 and at Alabama's law regarding the priority of mortgages and mechanic's and materialman's liens.

### A. History of Mechanic's Liens

The first mechanic's lien law was passed in Maryland in 1791. Alabama followed and enacted its first mechanic's lien statute in 1821, for the protection of its materialmen and mechanics. The underlying premise of the early statute was to protect and maintain the interest of the materialman. The Court in *Wimberly v. Mayberry & Co.,* 94 Ala. 240, 10 So. 157 (1891), recognizing that interest, stated:

> "The purpose of the act was to intervene in favor of the mechanic or material man, and secure to him a paramount lien upon what he put upon the land in the way of 'buildings or improvements or repairs thereto,' and prevent the operation of the common law, which, without the act, would give an existing mortgage or lien a priority over it. The property improved in such cases merges into the realty, but subject to the mechanic's lien to the extent of the value of the improvements. It was to protect those by whose labor and materials the value of the property was increased, as far as possible, to the extent of the enhanced value of the property."

94 Ala. at 246, 10 So. at 159.

The section of the statute concerning priorities remained virtually unchanged until 1933. Prior to 1933, a materialman had a definite advantage over a lender. The materialman was given absolute priority, and this put a severe burden on construction lenders. The plea of the construction lenders did not go unnoticed, however, and the legislature amended the priority section in 1933. [FN2] The effect of the amendment was *141 to reverse the priorities between the lien of a materialman and a prior recorded mortgage. [FN3]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

FN2. The earlier act read: "Such lien, as to the land, shall have priority over all other liens, mortgages, or incumbrances created subsequently to the commencement of the work on the building or improvement; and, as to the building or improvement, it shall have priority over all other liens, mortgages, or incumbrances, whether existing at the time of the commencement of the work, or subsequently created; and the person entitled to such lien may, when there is a prior lien, mortgage, or incumbrances on the land, have it enforced by a sale of the building or improvement under the provisions of this article, and the purchaser may, within a reasonable time thereafter, remove the same." *Ala.Acts.* 1876, No. 51, at 165-66.

FN3. After the amendment, the priority section read: "Such lien as to the land and buildings or improvements thereon, shall have priority over all other liens, mortgages or incumbrances created subsequent to the commencement of work on the building or improvement; and as to liens, mortgages or incumbrances created prior to the commencement of the work, the lien for such work shall have priority only against the building or improvement, the product of such work which is an entirety, separable from the land, building or improvement subject of the prior lien, mortgage or incumbrance, and which can be removed therefrom without impairing the value or security of any prior lien, mortgage or incumbrance; and the person entitled to such lien may have it enforced by a sale of such buildings or improvement under the provisions of this division and the purchaser may, within a reasonable time thereafter, remove the same." Ala.Code 1975, § 35-11-211. For a case construing the 1933 amendment, see *Empire Home Loans, Inc. v. W.C. Bradley Co.,* 286 Ala. 449, 241 So.2d 317 (1970).

However, even after the 1933 amendment the debate about the priorities between mechanic's and construction loan mortgages continued. See

Comment, *The Priority Problem Between Construction Mortgages and Mechanics' Liens in Alabama,* 6 *Cumb.L.Rev.* 23 (1975) (article favors mechanic's liens). One commentator has fittingly recognized the clash between the priorities of mechanic's liens and construction mortgages:

"The conflict here is between the two basic underlying public policies--one favoring a lien for those whose work or material has contributed to the improvement, and the other favoring the security of contracts and prior recorded mortgages, the availability of construction financing, a vigorous building industry, more construction starts, and more jobs for artisans, workers, and building material manufacturers, etc."

Scholl, *Priorities Between Mechanics' Liens and Construction Loan Mortgages in Alabama,* 23 *Ala.Law.* 398, 431 (1962) (article favors construction lenders).

*B. Steps to Perfection*

Mechanic's and materialman's liens, being statutory creations, can be perfected only by complying with the requirements found in Ala.Code 1975, § 35-11-210 *et seq. Lily Flagg Building Supply Co. v. J.M. Medlin & Co.,* 285 Ala. 402, 232 So.2d 643 (1970); *Wilkinson v. Rowe,* 266 Ala. 675, 98 So.2d 435 (1957). The liens are inchoate and will be lost if the lienors fail to perfect them according to the mandates of the statute. *Ex parte Douthit,* 480 So.2d 547 (Ala.1985); *United States v. Costas,* 273 Ala. 445, 142 So.2d 699 (1962).

Every mechanic or materialman must properly comply with three essential steps before a lien can be perfected: (1) provide statutory notice to the owner; (2) file a verified statement of lien in the probate office of the county where the improvement is located; and (3) file suit to enforce the lien. Ala.Code 1975, § 35-11-210. Each of these steps will be examined more closely below.

1. *Provide statutory notice to the owner.* According to § 35-11-210, there are essentially two types of liens, one for the full price of the materials furnished and another for the amount of the unpaid balance due the contractor from the owner. These two types of liens have been characterized as "unpaid balance" liens and "full price" liens. Hubbard, *A Current Overview of Alabama's*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*Mechanic's and Materialmen's Lien Law,* 49 *Ala.Law.* 203, 204 (1988).

Section 35-11-210 requires that written advance notice be given to the owner for a "full price" lien:
"[I]f the person, firm or corporation, before furnishing any material, shall notify the owner or his agent in writing that such certain specified material will be furnished by him to the contractor or subcontractor for use in the building or improvements on the land of the owner or proprietor at certain specified prices, unless the owner or proprietor or his **\*142** agent objects thereto, the furnisher of such material shall have a lien for the full price thereof as specified in the notice to the owner or proprietor without regard to whether or not the amount of the claim for such material so furnished exceeds the unpaid balance due the contractor, unless on the notice herein provided for being given, the owner or proprietor or his agent shall notify such furnisher in writing before the material is used, that he will not be responsible for the price thereof."

For a full price lien, the required notice must be given in order to provide the owner with a reasonable opportunity to object before the materials are used.

For an "unpaid balance" lien to be held by a materialman who is not the original contractor, the materialman must comply with the notice provisions of § 35-11-218, which provides in part:
"Every person, except the original contractor, who may wish to avail himself of the provisions of this division, shall before filing his statement in the office of the judge of probate, give notice in writing to the owner or proprietor, or his agent, that he claims a lien on such building or improvement, setting forth the amount thereof, for what, and from whom it is owing; and after such notice, any unpaid balance in the hands of the owner or proprietor shall be held subject to such lien."

With this notice, "the owner then can take appropriate action in the disbursement of remaining contract monies to the general contractor to insure that the potential lienors are satisfied and the property is not encumbered." Hubbard, *A Current Overview of Alabama's Mechanic's and Materialmen's Lien Law,* 49 *Ala.Law.* 203, 205 (1988).

Moreover, for a notice of lien given by a supplier of materials to have legal effect, it must be in substantial compliance with the Code provisions. *Kilgore v. First Assembly of God Church,* 477 So.2d 300 (Ala.1985); *Harris Paint Co. v. Ripps,* 289 Ala. 575, 269 So.2d 107 (1972). If notice is not properly given, a materialman's lien cannot be established.

The building industry today is operated on the basis of borrowed money, i.e., construction financing. Practically every corporation or would-be home owner must borrow. The practice in the industry has typically been that the construction loan funds will not be distributed in a lump sum. Rather, the funds are advanced from time to time as construction progresses, upon the lender's ascertainment (by the use of monitoring procedures such as vouchers and on-site inspections) that the work is indeed being completed or the supplies being furnished. This procedure allows the lender to actually corroborate the expenditures.

[1] Because of the practices in the construction industry, we hold that from this day forward, public policy dictates that the same written notice that is required to be given to the owner must also be given simultaneously to the construction lender, if the lender's identity can reasonably be obtained. We note that it would not be that difficult to obtain the identity of the construction lender, because the lender's mortgage would be on record in the office of the judge of probate. This notice would give the construction lender, as well as the owner, the opportunity to insure that the mechanics and materialmen are paid out of the remaining contract funds, that any potential liens are satisfied, and that the property is not encumbered. [FN4]

> FN4. Our holding is strengthened by the fact that the original contractor is also required, on certain occasions, to furnish the owner with a complete list of all materialmen, laborers, and employees who have furnished any material or done any labor for the contract. If the contractor fails or refuses to furnish the list, or if he fails to pay the materialmen in accordance with any special contract made with the owner, he shall forfeit his right to a lien. Ala.Code 1975, § 35-11-219.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

565 So.2d 138
(Cite as: 565 So.2d 138)

We recognize that our holding in this regard will not resolve all the various inequities of the statute. However, the notice will make the lender aware of the mechanic's possible claim, and, we hope, more claims will be paid and fewer liens filed.

*143 2. *File a verified statement of lien in the probate office of the county where the improvement is located.* The second prerequisite to enforcement of a lien is the filing of a lien statement, within different time periods, as dictated by statute, from the date the last work was performed on the project. Original contractors must file within 6 months, laborers must file within 30 days, and every other claimant must file within 4 months. Ala Code 1975, § 35-11-215. *Hartford Accident & Indemnity Co. v. American Country Clubs, Inc.,* 353 So.2d 1147 (Ala.1977); *Home Federal Savings & Loan Ass'n v. Williams,* 276 Ala. 37, 158 So.2d 678 (1963). The verified statement must be filed in the office of the judge of probate of the county where the property is located. Ala.Code 1975, § 35-11-213.

3. *File suit to enforce the lien.* The final step for perfection is to file suit in the circuit court of the county where the property is located (in the district court if the amount is less than $50). Ala.Code 1975, § 35-11- 220. Suit must be commenced within six months "after ... maturity of the entire indebtedness." Ala.Code 1975, § 35-11-221. More than likely, this will be the date of the last labor performed or the date materials were last furnished. *Yeager v. Coastal Mill Work, Inc.,* 510 So.2d 188 (Ala.1987).

C. *Application of Whether Bailey Mortgage Has a Meritorious Defense.*

[2] From the sparse record before us, we conclude that Gobble-Fite's lien was properly perfected. We now turn to Bailey Mortgage's argument that, despite foreclosure on the mortgages, it retained priority as a mortgagee over Gobble-Fite's liens, pursuant to § 35-11-211. Gobble-Fite argues that while Bailey Mortgage at one time held mortgages on the subject lots, when Gobble-Fite perfected its liens Bailey Mortgage had already foreclosed and no longer held the first priority of the mortgages.

Under Gobble-Fite's analysis, whenever a construction lender foreclosed under its power of sale, a materialman's lien would advance to a first priority by reason of the foreclosure. Furthermore,

stripping away the legal issues, the net effect of the trial judge's refusal to set aside the default judgment is that it elevates Gobble-Fite to first priority.

If we were to follow this reasoning, then in reality construction lenders would almost never foreclose. Ultimately, if lenders are unable to foreclose, they would also be compelled to no longer make any construction loans. This result would clearly stifle the construction industry as a whole and eventually punish everyone in the industry, including the very class of persons that the materialman's statute was designed to protect.

We disagree with Gobble-Fite's analysis and, for the foregoing reasons, hold that the holder of a prior mortgage that is superior to a mechanic's or materialman's lien who forecloses and purchases the property at the foreclosure sale does not lose its priority.

Gobble-Fite overlooks the underlying premise that the provisions of the mechanic's and materialman's statutes should be read in accordance with our other recording acts. Alabama is a "title theory" state, meaning that we adopt the general rule represented by the maxim "prior in tempore, potior in jure" (first in time, superior in right). Ala.Code 1975, § 35-4-90. In a "title theory" state, a mortgage passes legal title to the mortgagee, and the mortgagor is left with the equity of redemption. *Trauner v. Lowrey,* 369 So.2d 531 (Ala.1979). The order of priority between persons claiming an interest in the same property, by mortgage or otherwise, is fixed by the order in which they are filed for record.

Under our recording statutes, the recordation of a mortgage is notice to the whole world of the existence of the mortgage on the land, and those dealing with the land thereafter do so at their own peril. The gist of the instant case is that Gobble-Fite, in essence a junior lienee, is effectively attempting to collect its claim out of property that is subject to an older, valid lien. Further support for our conclusion is *144 found in the materialman's priority statute itself, because the statute does not attempt to secure to mechanics or materialmen a lien paramount to older valid liens.

[3] If foreclosure of a valid mortgage is properly conducted, all interests arising after the time the senior mortgage was created and all subordinate

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

interests will be cut off unless the junior lienors redeem during the specified time period provided by statute. Powell, *Law of Real Property* ¶ 463[6] (1949). See *Mid-State Homes, Inc. v. Butler,* 287 Ala. 584, 253 So.2d 511 (1971) (an ejectment action, where the Court held that where a mortgagee foreclosed its duly recorded mortgage, purchased the property at the foreclosure sale, and received a foreclosure deed to the mortgaged property, legal title vested in it paramount to any junior mortgage).

[4] After the foreclosure sale of the mortgaged property, if there are no other liens on the property, any surplus must be paid to the mortgagor. 55 Am.Jur.2d *Mortgages* § 930 (1971). However, if there are inferior liens and there is a surplus, all encumbrances inferior to the mortgage on which the sale is based must be paid in the order of time in which they respectively became liens. 55 Am.Jur.2d *Mortgages* § 931 (1971).

If there are no surplus proceeds, the only remedy or recourse available to a junior encumbrancer is the right to redeem. The statutory right of redemption is set forth in Ala.Code 1975, § 6-5-230. However, mechanics and materialmen are given a special right to redeem apart from § 6-5-230. Section 35-11-2 confers upon all mechanics and materialmen a statutory right of redemption. Section 35-11-2 provides in part:

"One who has a lien inferior to another, upon the same property, has a right:

"(1) To redeem the property in the same manner as its owner might, from the superior lien...."

Gobble-Fite cites our recent decision of *Lucas Construction, Inc. v. Hugel,* 551 So.2d 338 (Ala.1989), for the proposition that the purchaser of property at a non-judicial mortgage foreclosure enjoys no priority over properly perfected materialman's liens of which the purchaser had actual or constructive notice. In *Lucas,* the defendants were successors in interest to a mortgagee who, *after* a statement of lien was filed and other steps for perfection properly taken, foreclosed its mortgage and received a foreclosure deed. The question presented was whether the mechanic's lien was superior to their interest in the property. The issue was further complicated by the fact that the holder of the mechanic's lien did not name the original mortgagee as a defendant to the suit, as required by Ala.Code 1975, § 35-11-223(a).

To support our holding, we relied on the somewhat confusing case of *Hanchey v. Hurley,* 129 Ala. 306, 30 So. 742 (1900). In *Hanchey* it was observed, "By the purchase [at foreclosure] it [the mortgage] extinguished the mortgage debt, to the extent of the sum bid, and destroyed the lien of the mortgage." 129 Ala. at 310, 30 So. at 743.

*Hanchey* was cited on another occasion for the proposition that the holder of a mortgage that is superior to a mechanic's lien who forecloses and purchases at the foreclosure sale with notice of the lien takes his interest subject to the lien. See *Grimsley v. First Avenue Coal & Lumber Co.,* 217 Ala. 159, 162, 115 So. 90, 92 (1927).

However, in *Mallory v. Agee,* 226 Ala. 596, 147 So. 881 (1932), on application for rehearing, the Court stated the following about the case of *Hanchey v. Hurley:*

"Reverting to the case of Hanchey v. Hurley, supra, it is apparent that the writer (Justice Tyson) was of the opinion that such mortgagee foreclosure purchaser was entitled to such protection [that of bona fide purchaser]. The question was on the sufficiency of a bill in equity by the claimant of a superior equity accruing after the execution of the mortgage, and before foreclosure. It is not at all indicated that the other members of the court agreed with his views, but were of the opinion that the burden was upon the purchaser to invoke such right by affirmative assertion of claim to *145 it, and not on complainant to overcome it. But it is also said that the majority hold that, if complainant proves his claim as averred, he is entitled to relief. No one of the majority undertakes to write their views. The last statement may, or may not, have been based solely on the fact that the claim was defensive, as thoroughly refuted by Justice Tyson in such a proceeding as has by this court since been held.

"But the expression of the court may have been due in part also to a disagreement with him as to the rights of a mortgagee foreclosure purchaser. His views are stated as though they were his only, for he uses the first person. There iscertainly no indication of an express concurrence in them by the members of the court. We do not think that this court has ever so expressed an opinion. But we think the contrary is sound and results from a statement of the elements composing the claim as this court has defined them. A claim of the exact

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

565 So.2d 138
**(Cite as: 565 So.2d 138)**

sort as this is evidently so rare, no authority directly in point seems to be available. It is not our idea that the case of Hanchey v. Hurley, supra, supports either view, and we did not so aver."

226 Ala. at 600-01, 147 So. at 884 (citations omitted).

Therefore, we conclude that our reliance upon *Hanchey* in *Lucas v. Hugel* was in error. [FN5] *Lucas v. Hugel* and those cases that relied on *Hanchey* are expressly overruled. [FN6]

> FN5. Support for this conclusion is found in the fact that *Mallory v. Agee*, 226 Ala. 596, 147 So. 881 (1932), *Grimsley v. First Avenue Coal & Lumber Co.*, 217 Ala. 159, 115 So. 90 (1927), and *Hanchey v. Hurley*, 129 Ala. 306, 30 So. 742 (1900), were all cases involving priority. Those priority problems would not arise today because of the 1933 amendment that reversed the priorities of the materialmen and subsequent mortgagees.

> FN6. We would also note that our holding also necessarily overrules the holding on the second issue presented in *Ex parte Douthit*, 480 So.2d 547 (Ala.1985).

Gobble-Fite also argues that when a mortgage is foreclosed, and there is bid for the mortgaged premises an amount equal to the mortgagee's debt, the mortgage ceases to exist. *Aetna Insurance Co. v. Baldwin County Building & Loan Ass'n*, 231 Ala. 102, 163 So. 604 (1935). Admittedly, as a general rule that is correct, but only to the extent that it describes the relationship between the mortgagor and mortgagee. Most of the cases relying on that general rule involve the claims of a mortgagor and mortgagee to proceeds of an insurance policy for a loss that occurred before foreclosure. See *Smith v. Stockton, Whatley, Davin & Co.*, 487 So.2d 923 (Ala.Civ.App.1985); *Aetna Insurance Co. v. Baldwin County Building & Loan Ass'n*, 231 Ala. 102, 163 So. 604 (1935).

We summarize our conclusions thus far: First, at the time when the materials were furnished by Gobble-Fite, Bailey Mortgage's mortgage was on record. Second, Gobble-Fite properly perfected its materialman's lien, but it was inferior to Bailey Mortgage's mortgage. Third, because after Bailey Mortgage's foreclosure there were no surplus proceeds, the only remedy or recourse left to Gobble-Fite was the right to redeem under Ala.Code 1975, § 35-11-211. Therefore, Bailey Mortgage has established a meritorious defense and satisfied the first threshold prerequisite for setting aside the default judgment. [FN7]

> FN7. We are also aware that the legislature, apparently in response to our original opinion in this case, and our opinion in *Ex parte Douthit*, supra, and *Lucas v. Hugel*, supra, has recently amended § 35- 11-211. See Act 90-98, *Alabama Acts 1990*. The effect of the amendment is that foreclosure of any prior mortgage shall terminate and extinguish all subordinate materialman's liens, leaving in the materialman a statutory right of redemption. Section 35-11-211, as amended, reads in pertinent part:
> "35-11-211. Priority of Lien.
> "(a) Such lien as to the land and buildings or improvements thereon, shall have priority over all other liens, mortgages or incumbrances created subsequent to the commencement of the work on the building or improvement. Except to the extent provided in subsection (b) below, all liens, mortgages and incumbrances (in this Section, 'mortgages and other liens') created prior to the commencement of such work shall have priority over all liens for such work. Enforcement of such lien of a mechanic, materialman or other person created by section 35-11-210 (in this Section, 'mechanic or materialman lien') shall not affect any prior mortgage or other lien, and the purchaser in connection with the enforcement of such mechanic or materialman lien shall take the property subject to such prior mortgages and other liens of which the purchaser has actual or constructive notice on the date of purchase. Foreclosure of any prior mortgage or other lien shall terminate and extinguish such subordinate mechanic or materialman lien or other interest as to the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

land and the buildings and improvements thereon, whether or not at the time of such foreclosure such lien or interest has been perfected in accordance with the provisions of this division, and the mechanic, materialman or other person thereafter shall have, to the extent of his lawful claim under this division, the statutory right of redemption afforded under applicable redemption laws to a judgment creditor whose judgment was recorded on the date such work was commenced and such rights in any excess proceeds received by the foreclosing lienholder as provided by law.

"(b) ... If such mechanic or materialman lien for such work is not enforced prior to such foreclosure, the mechanic or materialman lien shall be terminated and extinguished and after such foreclosure, the mechanic, materialman or other person who held such mechanic or materialman lien thereafter shall have the statutory right of redemption and such rights in excess proceeds to the extent provided in subsection (a) above.

"(c) The provisions of this Act clarify and confirm the intent of the legislature regarding existing law governing the matters contained in this Act. The provisions of this Act shall apply to all mortgages and other liens and to all liens of a mechanic, materialman or other person created by section 35-11-210 existing on the effective date of this Act and those created or arising after such effective date."

**\*146 IV. WHETHER THE PLAINTIFF WILL BE UNFAIRLY PREJUDICED IF THE DEFAULT JUDGMENT IS SET ASIDE**

The second step in the three-factor analysis that the trial judge must consider is the prejudice befalling the nondefaulting party if the default judgment should be set aside. *Kirtland,* 524 So.2d at 606. Because Gobble- Fite has failed to show any prejudice of the kind discussed in *Kirtland,* we conclude that Gobble-Fite would not be unfairly prejudiced if the default judgment were set aside.

**V. WHETHER THE DEFAULT JUDGMENT**

**WAS A RESULT OF THE DEFENDANT'S OWN CULPABLE CONDUCT**

The final step in the three-factor analysis that the trial judge must consider is the culpability of the defaulting party's conduct. Conduct committed willfully or in bad faith constitutes culpable conduct for purposes of determining whether a default judgment should be set aside. Willful and bad faith conduct is characterized as incessant and flagrant disrespect for court rules, deliberate and knowing disregard for judicial authority, or intentional nonresponsiveness. *Kirtland,* 524 So.2d at 607-08. However, a defaulting party's reasonable explanation for inaction and noncompliance may preclude a finding of culpability. *Ex parte Illinois Central Gulf R.R.,* 514 So.2d at 1288.

[5] In support of its motion to set aside the default judgment, Bailey Mortgage attached affidavits of two of its employees stating that due to inadvertence, mistake, or excusable neglect, the summons and complaint were misplaced after service of process. After learning of the default judgment, Bailey Mortgage took immediate steps to retain counsel to set aside the default judgment.

We believe that Bailey Mortgage has set forth a reasonable explanation for its inaction and, thus, has precluded a finding of culpability on its part.

**VI. CONCLUSION**

[6] We conclude that Bailey Mortgage has met the three-part test set forth in *Kirtland* for the setting aside of the default judgment and that it should receive its day in court. Therefore, the trial court's refusal to set aside the default judgment was an abuse of discretion. *Kirtland v. Fort Morgan Authority Sewer Service, Inc.,* supra; *Ex parte Illinois Central Gulf R.R.,* supra. The judgment is reversed and the cause is remanded. The trial court is instructed to set aside the default judgment and to allow Bailey Mortgage a reasonable time in which to file its answer, and to proceed in a manner consistent with this opinion.

**\*147 APPLICATION GRANTED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED WITH INSTRUCTIONS.**

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

HORNSBY, C.J., and MADDOX, SHORES, HOUSTON and KENNEDY, JJ., concur.

JONES and ALMON, JJ., concur specially.

STEAGALL, J., concurs in the result.


ALMON, Justice (concurring specially).

For the future, Act No. 90-98 answers the question presented in this case, but it seems that the majority has prematurely given application to the new policy, to the detriment of Gobble-Fite Lumber Company, by overruling *Ex parte Douthit,* 480 So.2d 547 (Ala.1985), and *Lucas Construction Co. v. Hugel,* 551 So.2d 338 (Ala.1989). The result reached by this decision and the statute will in some cases unfairly place an economic burden on the materialman to redeem the entire property in order to recover a relatively small debt. The mortgagee bidding the outstanding amount of its debt at foreclosure will often make a profit on the value of the property in excess of that debt, and in some cases it will be economically unfeasible for a laborer or a materialman to redeem by paying the full amount of the foreclosure bid plus expenses, resell the property, and hope to recover his debt out of proceeds over and above the redemption price.

In light of the majority's decision to overrule *Douthit* and *Lucas,* I make no comment on whether the legislature's attempt to make Act No. 90-98 retroactive unconstitutionally deprives materialmen of their property rights. I concur specially because I think that Bailey Mortgage has stated a sufficiently meritorious defense to justify setting aside the default judgment. Even under the law as it existed prior to Act No. 90-98, the trial court could in some cases exercise its equitable powers and adjust the equities between the parties, so Bailey Mortgage might have been entitled to some relief from the default judgment holding its interest subordinate to Gobble-Fite's lien. *Rabren v. Andalusia Lumber & Supply Co.,* 279 Ala. 551, 188 So.2d 279 (1966); *East Gadsden Bank v. Bagwell,* 273 Ala. 441, 143 So.2d 438 (1962); *Baker Sand & Gravel Co. v. Rogers Plumbing & Htg. Co.,* 228 Ala. 612, 154 So. 591 (1934); *Pilcher v. E.R. Porter Co.,* 208 Ala. 202, 94 So. 72 (1922); *Birmingham Bldg. & Loan*

*Ass'n v. May & Thomas Hdw. Co.,* 99 Ala. 276, 13 So. 612 (1893).

JONES, J., concurs.

STEAGALL, Justice (concurring in the result).

I agree with Justice Almon's statement in his special concurrence that Act No. 90-98 has taken care of the problem presented in this case for the future. I also agree with his comment that the result reached by this decision and the statute will sometimes unfairly place an economic burden on the materialman to redeem the entire property in order to recover a relatively small debt. However, in view of the majority's decision on rehearing to overrule the cases we relied upon in our original opinion, I concur in the result.

565 So.2d 138

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works